NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

DIXON INDUSTRIES, INC., Respondent.

No. 81–1032.

United States Court of Appeals, Tenth Circuit.

Feb. 16, 1983.

Jonathan Saperstein, Washington, D.C. (W. Christian Schumann, Atty., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., with him on brief), for petitioner.

Peter T. Van Dyke of Lytle, Soule, Curlee, Harrington, Chandler & Van Dyke, Oklahoma City, Okl., for respondent.

Before HOLLOWAY and McWILLIAMS, Circuit Judges, and TEMPLAR,* District Judge.

McWILLIAMS, Circuit Judge.

Pursuant to section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 151, *et seq.*, the National Labor Relations Board seeks enforcement of its order against Dixon Industries, Inc. The issues to be resolved are whether the Board acted properly (1) in sustaining the Union's election challenges to three company leadmen on the ground that they were supervisors rather than employees, and hence ineligible to vote; (2) in overruling Dixon's objections to the election based on two Union leaflets which the Company claims contained material misrepresentations which affected the outcome of the election; (3) in finding that Dixon's admitted refusal to bargain with the Union as the elected representative of the Company's production and maintenance employees was therefore violative of section 8(a)(5) and (1) of the Act.

* Honorable George Templar of the United States District Court for the District of Kansas, sitting by designation.

Pursuant to a Stipulation for Certification Upon Consent Election, an election was held involving all full-time and regular part-time production and maintenance employees at Dixon's plant in Coffeyville, Kansas, where Dixon is engaged in the manufacture of lawn mowing equipment. Thirty employees voted for the Union, namely, the International Association of Machinists and Aerospace Workers, AFL–CIO, twenty-five voted against the Union, and five ballots were challenged and therefore not counted. At the election the Union had challenged the ballots of five persons, contending that four were supervisors rather than employees, and therefore ineligible to vote, and that the fifth was not a regular part-time employee but only a temporary employee.

Shortly after the election, Dixon filed objections to the election, alleging that the Union made two material misrepresentations shortly before the election which affected the outcome of the election. In this regard, Dixon claimed that the Union distributed a leaflet comparing the wages paid by Dixon to the wages paid by another company in Coffeyville with whom the Union had a contract. That leaflet, according to Dixon, contained inaccurate and misleading information. Further, Dixon claimed that the Union distributed a second leaflet comparing Dixon's rules regarding vacation time with the vacation rules of the other company, which leaflet also contained inaccurate and misleading information.

A Hearing Officer conducted an evidentiary hearing on the Union's five challenges and Dixon's objections to the election, and upheld three of the Union's challenges, disallowing two, and overruled Dixon's objections to the elections. Specifically, the Hearing Officer recommended that the Union's challenges to the ballots of Obie Estes, Steve Reedy, and John Burris be sustained for the reason that each was in fact a "supervisor" and hence, under the Act, not eligible to vote. The Union also challenged the ballot of Cal Harvey on the ground that he too was a supervisor. This particular challenge was disallowed by the Hearing Officer. The challenge to the fifth ballot by the Union, the ballot of George McDuffee, was also disallowed, the Hearing Officer finding that McDuffee was a regular part-time employee, and not a temporary one.

As concerns Dixon's objections to the election, the Hearing Officer recommended that they be overruled for the reason that the statements in the Union leaflets concerning pay and vacation time at Dixon compared with pay and vacation time at another company in Coffeyville were not such material misrepresentations as would warrant setting aside the election.

Dixon thereafter filed with the Board exceptions to the Hearing Officer's recommendations. After reviewing the record in light of Dixon's exceptions, a three-member panel of the Board adopted the Hearing Officer's findings and recommendations, and certified the Union as the validly elected representative of Dixon's employees in the production and maintenance department. One member of the panel dissented in part. See Dixon Industries, Inc. and International Association of Machinists and Aerospace Workers, AFL–CIO, Petitioner. 247 NLRB 1446 (1980).

Thereafter, the Union sent Dixon a letter requesting it to bargain. Dixon refused to bargain on the ground that the Board's certification of the Union was invalid. The Union then filed an unfair labor practice charge, and the Board's Regional Director issued a complaint, alleging that Dixon had violated, and was continuing to violate, section 8(a)(5) and (1) of the Act by refusing to bargain with the Union. Dixon filed an answer admitting the fact allegations in the complaint but claiming a good-faith refusal to bargain because of doubt as to the validity of the Board's certification. On motion for summary judgment, the Board found that Dixon was in violation of section 8(a)(5) and (1) and entered remedial orders. See Dixon Industries, Inc. and International Association of Machinists and Aerospace Workers, AFL–CIO, 252 NLRB 698 (1980). The Board now seeks enforcement of its order.

## I. Estes, Burris, and Reedy

Estes was the "leadman" in Dixon's transaxle department. Burris was the leadman in the assembly department. Reedy was the leadman in the company's fabrication department. Each proposed to vote in the plant election, and all were challenged by the Union on the basis that they were in fact supervisors and therefore ineligible to vote. All apparently cast their vote, but their ballots were segregated and not counted. As indicated, the majority of the Board vote adopted the recommendation of its Hearing Officer that the Union's challenges against Estes, Burris, and Reedy be sustained, finding that each was a "supervisor" as that term is used in the Act. Dixon argues here that such finding is not "supported by substantial evidence in the record considered as a whole." We do not agree.

Dixon in its "Job Classification," document refers to a so-called "leadman" as follows:

To assign work and to assist and train employees under his jurisdiction. To perform work as required. Maintain a high standard of quality, have parts and/or materials available to be worked and maintain records and assist in scheduling of work as required by supervisor. Keep supervisor informed of actions and performance of all employees and condition of equipment.

The fact that Dixon may have considered Estes, Burris, and Reedy to be "leadmen," as opposed to supervisors, does not resolve the issue of whether, under the Act, the three were, or were not, supervisors. The Act, 29 U.S.C. § 152(11), defines the term "supervisor" as follows:

The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

It is well-settled that an individual need possess only one of the types of authority enumerated in the section above set forth in order to be classified as a supervisor, assuming that the other requirements of that section are met. *Pacific Intermountain Express Co. v. NLRB*, 412 F.2d 1, 3 (10th Cir.1969) and *Furr's, Inc. v. NLRB*, 381 F.2d 562, 565 (10th Cir.) *cert. denied*, 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105 (1967). A determination as to whether an individual is a supervisor within the meaning of the Act is one which calls on the Board's "special function of applying the general provisions of the Act to the complexities of industrial life." *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963). The Board's determination of supervisory status is entitled to weight by the judiciary since "the gradations of authority 'responsibly to direct' the work of others . . . are so infinite and subtle that of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function. . . ." *NLRB v. Swift and Co.*, 292 F.2d 561, 563 (1st Cir.1961), quoted with approval in *NLRB v. Corral Sportswear Co.*, 383 F.2d 961, 963 (10th Cir.1967), *cert. denied*, 390 U.S. 995, 88 S.Ct. 1196, 20 L.Ed.2d 94 (1968).

The Hearing Officer conducted a detailed evidentiary hearing concerning the Union's challenges to the ballots of Estes, Burris, and Reedy. Some sixteen persons testified at length, some from management and others being rank-and-file employees of the company. Estes, Burris, and Reedy all testified, and, in effect, denied that they were "supervisors" within the meaning of the Act. However, the testimony of Estes, Burris, and Reedy, concerning details of their day-to-day work activities, was disputed, in some instances, by the rank-and-file employees, and the Hearing Officer in his report indicated quite clearly that in such instances he chose to believe the employees.

The report of the Hearing Officer, as it relates to Estes, Burris, and Reedy, is attached as an appendix to the Board's De-

cision and Certification of Representative, and appears at 247 NLRB at 1447. The reader of this opinion is directed to the Hearing Officer's "Finding of Fact, Conclusions and Recommendations." In his report, the Hearing Officer analyzes the evidence in great detail, and on an individual basis. Such will not be repeated at length here. It is sufficient to note that the Hearing Officer found that Estes qualified as a "supervisor" because he used independent judgment in training, instructing, inspecting, assigning, reassigning, and transferring employees in the transaxle department; that Burns "responsibly directed" employees in their work and used independent judgment in scheduling work in the assembly department; and that Reedy had "complete control" of the company's fabrication department. We regard the question of whether, for example, Este's day-to-day activities on the job as leadman in the transaxle department constitute being a supervisor to be essentially a question of fact, and, in our view, the record supports the various findings of the Hearing Officer.

## II. Misrepresentation by the Union In Pre-election Campaign Leaflets

As indicated, Dixon objected to the election on the grounds that the Union distributed two leaflets which, in the eyes of Dixon, contained misrepresentations relating to Dixon's wage scale and vacation procedures as compared with those of another company in Coffeyville, Kansas, with whom the Union had a contract. The Hearing Officer recommended that such objections be overruled, and the Board unanimously adopted such recommendation. In this connection, we find no error in the Board's order.

█ Although the integrity of a plant election must of course be maintained, a representation election is not to be lightly set aside. There is a presumption that ballots cast under the safeguards provided by Board procedure reflect the true desires of the participating employees. *NLRB v. Zelrich Co.,* 344 F.2d 1011, 1015 (5th Cir.1965). Consequently, the objecting party bears "a heavy burden" of demonstrating that the election was not fairly conducted. *Shoreline Enterprises of America, Inc. v. NLRB,* 262 F.2d 933, 942 (5th Cir.1959). In general accord, see *Kustom Electronics, Inc. v. NLRB,* 590 F.2d 817, 822 (10th Cir.1978), where the objecting party was said to have the burden of showing that the misrepresentations were "substantial."

█ Were the alleged misrepresentations in the instant case so substantial that they probably affected the outcome of the election, or, on the contrary, were the statements in the Union leaflets merely campaign rhetoric of a type which often occurs in an election of this sort? The Board, in overruling the objections, determined that the statements fell into the latter category. We are not inclined to disturb this ruling.

The first leaflet distributed by the Union three days before the election was entitled "Let's Compare Wages with a Winner." The leaflet purported to compare wages paid by Dixon with wages paid by another company in Coffeyville with whom the Union had a contract. Dixon claims that the comparison was "unfair," and did not give a true picture. In this regard, Dixon had come out with a revised wage scale shortly before the election. Be that as it may, we are not inclined to disturb the Board's holding that this type of misrepresentation, if indeed it was a misrepresentation, is of such magnitude as to require the setting aside of a plant election.

The second Union leaflet compared the vacation rules of Dixon with those of the other company and suggested that the employees at the other company had more of a voice in determining when vacations would be taken, and the like, than did Dixon's employees. We regard this to be a minor matter.

As indicated, Dixon admittedly refused to bargain with the Union, such refusal being based on Dixon's belief that the Union was improperly certified. Having now determined that the Board's certification of the Union was valid, it necessarily follows that Dixon's refusal to bargain was a violation of section 8(a)(5) and (1) of the Act. See

*May Department Stores Co. v. NLRB*, 326 U.S. 376, 383–84, 66 S.Ct. 203, 208, 90 L.Ed. 145 (1945) and *NLRB v. Champa Linen Service Co.*, 437 F.2d 1259, 1262 (10th Cir. 1971).

Order enforced.